Filed 4/29/26  In re Bethany C. CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re BETHANY C. et al., Persons Coming Under Juvenile Court Law. | B350446 |
| PEDRO P., <br><br> Petitioner, <br><br> v. <br><br> THE SUPERIOR COURT OF LOS ANGELES COUNTY, <br><br> Respondent; <br><br> LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, <br><br> Real Party in Interest. | Los Angeles County Super. Ct. No. 23CCJP03654A-D |

ORIGINAL PROCEEDINGS in mandate. Dash Talbot, Commissioner. Petition denied.

Los Angeles Dependency Lawyers, Inc., and Law Office of Emily Berger, Dominika Campbell and Nadia Salcedo, for Petitioner.

No appearance for Respondent.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Sarah Vesecky, Principal Deputy County Counsel, for Real Party in Interest.

Children's Law Center, Liz Lopez and Angelina Oducayen Ongkeko, for Minor Pedro P., as Joinder on behalf of Real Party in Interest.

Children's Law Center, Taylor Lindsley, for Minors Bethany C., Emily P., and Ruby P., as Joinder on behalf of Real Party in Interest.

## INTRODUCTION

Father Pedro P., through his counsel, filed in this court a petition for extraordinary writ seeking review of the juvenile court's order terminating his reunification services and setting a Welfare and Institutions Code[1] section 366.26 hearing for March 2026. We stayed that hearing pending resolution of Father's petition.

By the petition, Father contends substantial evidence did not support the juvenile court's finding that the Los Angeles County Department of Children and Family Services (DCFS) provided him reasonable reunification services and that the court abused its discretion in not continuing the section 366.26 hearing. Finding no error, we deny the petition.

## FACTUAL AND PROCEDURAL BACKGROUND

The minor subjects of these proceedings are Bethany (born 2009), Emily (born 2011), Pedro (born 2015), and Ruby (born 2019).[2] Though they are United States citizens, they came to the attention of DCFS in 2023 while they were housed at a shelter in Mexico run by the Sistema Nacional para el Desarrollo Integral de la Familia (DIF), a Mexican public welfare agency.

---

[1]     Undesignated statutory references are to the Welfare and Institutions Code.

[2]     Though their last names differ, the children share the same parents.

DIF had detained the children from Father and Mother, C.C.,[3] on September 4, 2023, based on reports of neglect and domestic violence. Even though some of the children were well into school age, none had ever attended school. Father tested positive for cocaine at the time of their detention.

Six weeks after the detention, the parents had not come looking for them. The United States Consulate had no information regarding the parents' whereabouts and believed they had abandoned the children. Accordingly, it asked DCFS to repatriate the children.

A DCFS social worker retrieved the children from the United States Consulate at the San Ysidro Border Crossing and brought them to a foster placement in Los Angeles. The juvenile court ordered their continued detention.

Though the children initially gave guarded statements to DCFS about life in their parents' care, they opened up once in foster care. They related that the parents would spend Father's earnings on drugs. Mother did not work and played video games all day. Bethany was forced to do odd jobs to earn money for food for the family and also took on caretaking responsibilities for the other children. At times there was no food and the children were reduced to eating powdered milk. Father violently disciplined them. Emily detailed an instance in which Father "hit[] [her] until he was tired with anything he could find, with phone cable, belt, choked her and hit her with heavy objects around the house." Regular punishment of each of the children included choking them, lifting and throwing them, and slamming their heads against the toilet.

DCFS notified Father of the juvenile court proceedings via WhatsApp in November 2023. Later that month, DCFS interviewed him by telephone. He reported he was living in Rosarito, Baja California, Mexico. He did not know where Mother

_____

[3] Mother is not a party to this writ. We omit information about her except as relevant to Father's claims.

was. He requested an attorney be appointed for him. He also expressed anger that DIF had caused the children to be sent to the United States. According to Father, he had been working to reunify with the children through a process in Mexico.

Father appeared at the juvenile court's November 2023 arraignment hearing and the court appointed counsel for him. The court also ordered DCFS to prepare a written schedule of video and telephonic visits between Father and the children.

At a combined jurisdictional and dispositional hearing in March 2024, the juvenile court sustained DCFS's amended section 300 petition as to each child. The sustained allegations against Father were that he (1) abandoned the children at the DIF shelter without making a plan for their care and supervision; (2) had a history of substance abuse, including methamphetamine, which rendered him incapable of caring for the children; (3) had failed to provide the children with regular educational instruction; (4) had engaged in violent altercations with Mother in the children's presence; and (5) had repeatedly struck the children with a belt. The court ordered the children removed from the parents and ordered reunification services for Father (Mother's whereabouts remained unknown).

Father's court-ordered case plan consisted of a full drug and alcohol program with aftercare; weekly random and on-demand drug and alcohol testing; a 12-step addiction treatment program; a developmentally appropriate parenting program; a 52-week domestic violence program for batterers; and individual counseling, with a licensed therapist or supervised intern, to address case issues.

Father could not visit the United States in person due to his immigration status. Accordingly, DCFS coordinated with DIF to offer him services. DIF offered Father parenting classes, a drug and alcohol program and individual counseling, but could not provide no-cost drug testing. Father did not have the resources to pay for drug testing, and restrictions on DCFS

4

funding did not allow it to pay for services outside of the country. As of July 2024, Father provided evidence he was enrolled in the DIF parenting program but not the other programs.

Visitation was also necessarily remote. During the initial six-month review period, from March to September 2024, "family time with [F]ather and children [was] sporadic and inconsistent." Father initially did try to contact the children but did not respect the agreed visitation calendar. On calls, only one child, Bethany, was willing to engage with him; the others expressed no interest. As of August 2024, Emily affirmatively stated she did not want to talk to Father at all.

During the calls, Father would ask Bethany about the other children's wellbeing and make false promises, such as that the children would be "coming home soon." According to the foster parent, Father appeared to be under the influence on calls.

After a 2024 Father's Day call, in which Mother appeared on camera but Father refused to let her speak, Father made no attempt to contact the children for several weeks. He apparently had one or more visits in August 2024 but then stopped calling again for months. In January 2025, DCFS reported Pedro reported not wanting contact with either parent. Father had no contact with the children between August 2024 and at least February 26, 2025.

During this time, Father's communication with DCFS was also wanting. On February 14, 2025, DCFS reported Father had not been in contact with the social worker for over five months, despite the social worker sending him five different e-mails during this period. It said this to the juvenile court about his progress: "[Father] demonstrates he is[] not in compliance with court[-]ordered[] case plan activities and is not demonstrating change or efforts to engage with [DCFS] to pursue his family goal to reunify with the children. [He] has not [provided] DCFS with a mailing address. It is unknown if he has stable housing, work, address substance abuse disorder [*sic*]. His lack of participation

5

in family time visits[,] in combination with his lack of compliance with the court[-]ordered case plan, demonstrates his unwillingness to change his behavior and or address the issues that brought the matter before the court and to the attention of DCFS. It is [DCFS]'s observation that there is a lack of bonding with the children give[n] his poor efforts in complying with family time. At this time, [F]ather seems to lack the ability to provide a nurturing and safe home for the children."

The same day DCFS made this report, Father e-mailed the DCFS social worker. He explained he had been "absen[t] in the last few months [from] video calls . . . because [he] had a peak season opportunity of work that made the most of those few months of work." He declared: "I am ready to be consistent in my calls with my children." He also reported he had taken a drug test that day and, though he was unable to reach his DIF social worker while she was on vacation, "[he] was able to talk with . . . Psychologist Exa Liliana Valderama who granted [him] an appointment for March 6, 2025 in order to review [his] plans, finished plans, learning review and others."

A week later, Father provided documents to show he participated in Narcotics Anonymous (NA) meetings—22 out of the 36 DIF had recommended. He had also taken two nonrandom drug tests in the previous eight days. Both were positive for marijuana. They tested only for marijuana, amphetamines, methamphetamines, cocaine, and opiates. They did not test for alcohol. DCFS noted to the juvenile court that Father was not in compliance with his court-ordered case plan, had not gained insight, and failed to address the safety concerns which led to the dependency proceedings.

A few weeks later, DIF forwarded to DCFS a letter ostensibly from the psychologist Father mentioned in his February 14, 2025 e-mail. It contained a statement from Father, rather than any service provider, that he had made progress in a variety of ways, gaining insight through counseling with a

psychologist named Valentina, Alcoholics Anonymous (AA), NA, and parenting classes. In the section describing the outcome of the interview, the psychologist added that Father arrived on time to his appointment and had completed his assigned programs. Proof of attendance at certain programs was attached. This included a form showing Father had participated in 14 sessions of psychotherapy between May and August of 2024.

Notably, some of Father's statements relayed in the letter were demonstrably false or misleading. For example, he reported visiting with the children three times per week. But at the time of the letter he had just resumed seeing them once per week after his six-month absence. Adding to the embellishment, he said this communication—in which he claimed to have shared with the children that he "didn't know how to be a father" but was "working on being a better person"—"ha[d] helped a lot," shown him his "children are healing," and allowed him to view them not "as traumatized children."

Father further reported he and Mother were in a good place and planned to marry. However, Mother had recently told DCFS that she left Father and was moving back to California. He also reported he had not used methamphetamines since 2022 and was clean. But DIF reported Father tested positive for cocaine in 2023 and the only drug testing he underwent during the case to that point showed he was currently using marijuana.

DCFS filed a report with the juvenile court on June 30, 2025. In the four and a half months since his declaration that he was "ready to be consistent" in his calls with the children, Father had had two calls, and these were with just Bethany and Ruby. It is unclear from the report whether these calls were the "1x weekly video chats on Sunday afternoons" Father "[r]ecently . . . started." What is clear is all the children reported not wanting to talk to Father. Bethany said she did not want to make him think she wanted to return to his home. Emily said hearing

his voice reminded her of the physical abuse and trauma she suffered in his care. Pedro said he just did not feel like it.

At a section 366.22 hearing held July 14, 2025, the juvenile court found Father had made partial progress toward addressing the case issues. It found DCFS had complied with the case plan, including by making reasonable efforts to return the children to a safe home.[4] The court ordered DCFS to continue providing reunification services; provide Father a written visitation schedule; contact Father to discuss availability for virtual individual counseling and domestic violence classes; and contact the children's therapists to assess conjoint counseling with Father.

Pursuant to this directive, DCFS inquired with the children's therapist who assessed them on August 5, 2025. The therapist wrote the children "currently appear hesitant to engage in conversations with their biological parents." She continued: "This may be a temporary response related to recent family dynamics and could evolve as therapeutic work continues. The children will continue to work on building the therapeutic relationship, as well as working towards processing past traumas and building healthy coping skills to manage overwhelming feelings."

DCFS further sent Father referrals for online classes. Father requested referrals for domestic violence classes, family counseling, and individual counseling. Father reported to DCFS he was unable to register for the classes because he did not understand how to enroll and asked DCFS to enroll him and pay for the classes directly. DCFS responded it was unable to do so.

---

[4]     Father appealed the July 14, 2025 order. His counsel filed a no-issue brief pursuant to *In re Phoenix H.* (2009) 47 Cal.4th 835. Father's supplemental brief was due March 6, 2025. He did not file one, and the appeal was dismissed. (See case No. B348653.)

DCFS also provided Father with a referral for on-demand drug testing in the Rosarito area and sent him leads on local online substance abuse programs.

Father completed four on-demand drug tests in September 2025—for amphetamines, methamphetamines, marijuana, cocaine and opiates, but not alcohol. Each came back negative. The following month, he tested negative for both drugs and alcohol.

Father also reported trying to find an outpatient drug rehabilitation program through DIF but it offered only inpatient programs. DCFS asked him to inquire with DIF about any outpatient programs outside of DIF that he might enroll in. He did not reply to this request.

Father did complete an online domestic violence course for batterers. According to the certificate, he completed 52 lessons, and "[o]ne lesson is equal to one hour or one week of class instruction." Records from the provider indicate he completed 24 of the lessons in the 13 days between September 15 and September 28, 2025.

According to DCFS, Father never enrolled in individual counseling, despite DCFS providing both Spanish and English language referrals in July 2025.

Regarding visitation, only Ruby was willing to talk to Father after July 2025, but she later changed her mind. Even in the face of this reticence, DCFS insisted that the children's caregiver inform the children of Father's calls and give them an opportunity to speak to him. The caregiver responded that she understood, had been doing so, and would continue to do so.

DCFS's October 2025 status report listed four occasions, all in September and October, on which Father attempted remote visits with the children since the juvenile court's July 2025 order. The children refused each time. Attached to the report were "affidavits" from each of the children stating, in their own handwriting, that they do not want to talk to the parents, one of

which also specified that no one was telling them to say that. In noting its efforts to encourage the children to participate in parent visits, DCFS described how the children "are irritated when asked about contact with parents."

The juvenile court held its section 366.25 hearing over two days in November 2025. Father appeared remotely and testified on the first day. He described efforts to complete his case plan and instances in which DCFS was unhelpful. In a September 2025 meeting with DCFS, for example, he said he proposed submitting to weekly testing, but complained DCFS did not follow up with him. After that meeting, he testified he proposed two different substance abuse programs in Mexico but DCFS did not validate them. He said DCFS had provided referrals only for programs that did not satisfy its own requirements.

Despite DCFS's assertion to the contrary, Father testified he did undergo individual counseling. He said it was with a DIF psychologist named Valentina Fregoso. Through that counseling, he said he "learned . . . all the things that [he] did wrong and the things that [he] need[ed] to improve." He did not say how many times he had seen, or for how long he had been seeing, this psychologist. He also said he invited DCFS to communicate directly with her but it never did. When his counsel asked him to describe what he learned through this counseling, he responded: "Well, one of the things that come[s] to mind is that . . . children go through different stages. . . . I was treating them as if I was treating an adult. But then I learned that you can't educate children in the same way that you educate an adult. And so that is why I am learning so much now. I am making an effort to learn all these different stages that the children go through in order to be a better parent."

At argument, Father's counsel asked the juvenile court to find DCFS had failed to provide reasonable services and to therefore extend reunification pursuant to section 352. Counsel argued Father had complied with the court-ordered case plan to

the best of his abilities and DCFS failed to give him due credit for his efforts. For example, counsel contended Father's meeting with the DIF psychologist satisfied the individual counseling component and any shortcomings relating to the drug and alcohol components of the plan were DCFS's fault for not providing adequate referrals. Counsel further claimed DCFS did not do enough to facilitate Father's relationship with the children.

The juvenile court took the matter under advisement and announced on the second day of the hearing its decision to terminate Father's reunification services and set a section 366.26 hearing. It explained to Father as follows: "I know you have done what you can in a lot of ways to complete the court[-]ordered case plan. And there ha[ve] been some limits about what you can do and what [DCFS] can do to assist based on you residing in Mexico for much of this case."

"But while you have done the 52-course domestic violence program, you have been to A.A./N.A., you have tested, you have done parenting, you have done some individual counseling, I don't think you have shown . . . any insight into why the kids were removed or why they can't be returned to you or what you needed to work on during those programs. [¶] . . . [¶] . . .

"Part of it was in individual counseling you spoke to the therapist in Mexico. But you did not inform [the therapist] really about what the case issues were. And you did not really address the case issues with that therapist, I think, in a meaningful way. You provided that therapist with some incorrect information, also, regarding why the case was open and your level of contact with the kids and your level of cooperation with [DCFS].

"But also part of the reason is also your testimony indicating that what you would change is you would not treat the children as adults, if they were returned to you. And that is what you learned in the class. But that is really not the reason why this case is here . . . .

11

"The [children] also have shown a lack of interest or not wanting to visit or talk to you because they indicate that when they hear your voice . . . they are triggered. They are reminded of the abuse they endured, the physical abuse, the domestic violence, and a number of other issues that were going on in the home. And because you have not addressed those issues, I don't find that the [children] can safely be returned to you today."

Finally, the juvenile court declined to extend Father's time to reunify under section 352. It believed it lacked legal authority to do so, but even if it had such authority, it found no extraordinary circumstances to justify any extension and no substantial probability of return within the next six months.

The juvenile court advised Father of his writ rights, and he timely filed this writ. We ordered the section 366.26 hearing stayed until its resolution. DCFS and Pedro filed answering briefs opposing Father's petition, and the other three children joined in the brief by DCFS.

## DISCUSSION

### I. Reasonable Services

#### A. Law and Standard of Review

In the process of assisting a parent in reunifying with their child, county welfare departments like DCFS are obligated to provide or offer reasonable services to promote such reunification. (§§ 361.5, subd. (a), 366.21, subd. (g)(1).)

At the section 366.25 hearing in November 2025, the juvenile court was required to "determine whether reasonable services ha[d] been offered or provided" to Father. (§ 366.25, subd. (a)(3).) DCFS asserts any error in this finding is harmless because the court made reasonable services findings at prior hearings that Father failed to effectively challenge. We disagree. Father's request for a continuance, the denial of which he also challenges, was predicated on not having received reasonable services at least during the most recent review period. Accordingly, we will consider his challenge of the finding. (See *In*

12

*re A.O.* (2025) 111 Cal.App.5th 1048, 1060 ["an erroneous reasonable services finding could impede the court's ability to fully and accurately evaluate [a section 352 continuance] request"].)

" ' "Reunification services implement 'the law's strong preference for maintaining the family relationships if at all possible.' . . ." . . . The [county welfare] department must make a " ' "good faith effort" ' " to provide reasonable services responsive to the unique needs of each family. . . . "[T]he plan must be specifically tailored to fit the circumstances of each family . . . , and must be designed to eliminate those conditions which led to the juvenile court's jurisdictional finding. . . ." . . . The effort must be made to provide reasonable reunification services in spite of difficulties in doing so or the prospects of success. . . . The adequacy of the reunification plan and of the department's efforts to provide suitable services is judged according to the circumstances of the particular case. . . . "[T]he record should show that the supervising agency identified the problems leading to the loss of custody, offered services designed to remedy those problems, maintained *reasonable* contact with the parents during the course of the service plan, and made *reasonable* efforts to assist the parents in areas where compliance proved difficult . . . ." ' " (*In re K.C.* (2012) 212 Cal.App.4th 323, 329–330.) The standard is not what services would have been ideal, but what services were reasonable under the circumstances. (*In re Misako R.* (1991) 2 Cal.App.4th 538, 547.)

We review the juvenile court's reasonable services finding for substantial evidence. (*In re A.O.*, *supra*, 111 Cal.App.5th at pp. 1061–1062.) The parties do not address whether the absence of a clear and convincing evidence standard in section 366.25, subdivision (a)(3) (in contrast to other provisions in the code; see, e.g., § 366.21, subd. (g)(1)(C)(ii)) affects our standard of review. Nevertheless, because the court stated its finding under the clear and convincing evidence standard, we will review the record for

13

substantial evidence "account[ing] for the level of confidence" demanded by the clear and convincing evidence standard. (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 995.) Accordingly, "the question before [us] is whether the record as a whole contains substantial evidence from which a reasonable factfinder could have found it highly probable that the fact was true." (*Id.* at p. 1011.) Our review of the record otherwise is conducted under the familiar principles for evaluating the sufficiency of evidence in support of a factfinder's determination. (*Ibid.*)

## B. Analysis

Substantial evidence supports the juvenile court's conclusion that DCFS offered Father reasonable services.

Father lost custody of the children for several reasons: abandoning them at the DIF shelter; abusing narcotics; never sending them to school; and engaging in violence against them and against Mother in their presence. The juvenile court ordered services targeted to address these issues.

DCFS worked to offer Father services in accordance with the juvenile court's order but was limited by the fact that he resides in Mexico. Limitations on DCFS funding and familiarity with resources in Mexico made this a challenging case but one in which the court had a sufficient basis on which to conclude DCFS worked reasonably to fulfill its obligations. These efforts necessarily took a different form than they would in the typical case. For example, DCFS had to independently research local resources, evaluate unfamiliar programs for compliance, coordinate with DIF, and rely, to some extent, on Father's preexisting relationship with DIF to facilitate services.

Unsurprisingly, the services Father undertook did not match, to the letter, what the juvenile court initially ordered or what DCFS advised Father he needed to undertake. However, it is clear from the court's analysis that it was satisfied with the alternative programming DCFS arranged for Father and what

14

Father, at DCFS's prompting to coordinate with DIF, arranged for himself.

The juvenile court acknowledged Father "ha[d] done what [he] c[ould] in a lot of ways to complete the court[-]ordered case plan." Even though Father did not complete an outpatient drug and alcohol treatment with aftercare, the court credited him for attending AA and NA and for testing for drugs and alcohol. The court did not suggest Father had failed to make progress in his sobriety.

The juvenile court also credited Father for completing his 52-course domestic violence program, even though it did not occur over the course of 52 weeks. The court did not suggest Father had failed to make progress in avoiding domestic violence.

What the juvenile court did take issue with was Father's lack of insight into why the children were removed from him. The court credited Father for taking the parenting classes it ordered, but faulted him in the area of individual counseling, which it had ordered him to take "to address case issues." Because the court did not take issue with Father's progress in other areas of his case plan, our consideration of the adequacy of DCFS's service offerings is properly focused on individual counseling.

The record reflects Father met with two different psychologists in Mexico. He met with one on 14 separate occasions in 2024. He met with the other at least once in March 2025. What little information the record contains about this counseling supports the juvenile court's conclusion that Father did not take full advantage of the counseling he received. The March 2025 letter from one psychologist shows Father reported false information to her about his circumstances and does not address fundamental case issues. Most prominently, there is no mention of his past violence against the children or the extreme neglect that kept them out of school and left them unfed in his care before he abandoned them at a DIF shelter.

15

The record further reflects that, in July 2025, DCFS offered Father additional individual counseling. This counseling was offered online, in both English and Spanish. Father never enrolled in this counseling.

Father argues he was prejudiced by DCFS's failure to offer reasonable services because it limited his opportunities to comply with the juvenile court's requirements and improve his parenting abilities. The record shows Father received extensive services within all the general categories ordered by the court and was offered more services that he did not undertake. This supports the conclusion that, rather than a lack of reasonable services, it was Father who did not avail himself of individual counseling opportunities offered by DCFS and did not adequately engage in the counseling he obtained through DIF. (See *In re Jasmon O.* (1994) 8 Cal.4th 398, 424–425 [services found reasonable where effectiveness of services provided to the father limited by the father's failure to admit issue existed]; *In re Nolan W.* (2009) 45 Cal.4th 1217, 1233 [reunification services are voluntary and cannot be forced on an unwilling or indifferent parent].)

In a similar vein, Father argues DCFS did not do enough to facilitate visitation between him and the children. While there is evidence DCFS's performance in this regard was imperfect, there is substantial evidence it was reasonable under the circumstances. The children did not want to talk to Father and their therapist deemed them not ready for contact with him. DCFS did not arrange conjoint counseling, but the juvenile court never ordered it—it merely directed DCFS to assess it. DCFS did so and the children's therapist's letter indicates it was not appropriate at the time. We cannot say conjoint counseling was a required "reasonable service" on this record.

There was a time in the case when the children had a greater willingness to communicate with Father, but Father ceased communication with them for periods of up to six months. Further, the children's history of trauma caused by Father (the

16

same trauma he minimized in his report to his DIF psychologist) created a substantial barrier to the children's willingness to communicate with him. In providing or offering reasonable services, DCFS is held to a standard of good faith, not good outcomes. There is evidence that, even in the face of their understandably steadfast reticence, DCFS continued to ensure the children had opportunities to communicate with Father. The children simply did not want to.

## II. Denial of Continuance

### A. Law and Standard of Review

Section 352, subdivision (a)(1) provides: "Upon request of counsel for the parent . . . , the court may continue any hearing under this chapter beyond the time limit within which the hearing is otherwise required to be held, provided that a continuance shall not be granted that is contrary to the interest of the minor. In considering the minor's interests, the court shall give substantial weight to a minor's need for prompt resolution of his or her custody status, the need to provide children with stable environments, and the damage to a minor of prolonged temporary placements." Subdivision (a)(2), in turn, requires a showing of "good cause" before a continuance may be granted.

Section 352 offers an " 'emergency escape valve' " to delay a section 366.26 permanency planning hearing in "exceptional cases." (*Michael G. v. Superior Court* (2023) 14 Cal.5th 609, 634, 635, 637 (*Michael G.*).) Such cases include " 'when "inadequate services" are offered by the child welfare agency or "an external force over which [the parent has] no control" prevented the parent from completing a case plan.' [Citation.] Examples include cases where a parent never receives reunification services or a reunification plan over the 18-month reunification period [citations]; the parent was hospitalized for most of the reunification period but demonstrated an 'impeccable record of visitation and efforts to comply with the reunification plan' [citations]; or the parent sought a continuance to complete a

17

program required by the reunification plan that was otherwise impossible to finish in time." (*Id.* at pp. 632–633.) Even if exceptional circumstances are present, a continuance is unwarranted if contrary to the child's interests. (*Id.* at pp. 637–638.)

A juvenile court's decision on whether to grant a continuance is reviewed for abuse of discretion. (*Michael G.*, *supra*, 14 Cal.5th at p. 637.)

### B.    Analysis

Father fails to show an abuse of discretion in the juvenile court's decision to deny his request for a continuance. His argument fails to address at all whether such a continuance would be contrary to the interests of the children. This is independently sufficient to defeat his challenge. (See § 352, subd. (a)(1) [not contrary to child's interests is an independent requirement for continuance].) Critically, the children's cases had been pending for over two years by the time of the hearing, and the children had been in the DIF system for a considerable amount of time before the cases started. The children had all made clear they were not interested in reunifying with Father. Indeed, the juvenile court "[did] not think [it] c[ould] find that there [was] a substantial probability of return . . . within the next six months." It was well within the juvenile court's discretion to deny the request on this basis alone.

Even if extraordinary circumstances were independently sufficient to sustain the challenge, Father fails to show them. In attempting to do so, he again argues DCFS's asserted shortcomings in supporting his services in Mexico denied him a meaningful opportunity to reunify. But again, the record shows he received substantial services generally satisfying his case plan and the juvenile court credited him for "do[ing] what [he] c[ould] in a lot of ways to complete the court[-]ordered case plan." Ultimately the issue was, despite receiving extensive services and the opportunity to do more, Father failed to demonstrate insight

18

into the circumstances that brought the children under the court's jurisdiction. The record showed he had not honestly confronted the issues head-on. And certainly, as Pedro notes in his answering brief, Father's complete disengagement from the case for a six-month period did not help matters. These facts are a far cry from the extraordinary circumstances described in *Michael G.*, *supra*, 14 Cal.5th at page 637.

## DISPOSITION

The petition is denied. Pursuant to California Rules of Court, rule 8.490(b)(2)(A), this opinion is final forthwith as to this court.


RICHARDSON, J.


WE CONCUR:


CHAVEZ, Acting P. J.


GOORVITCH, J.[*]

---

[*]     Judge of the Los Angeles County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

19